UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEXANDER MILNE,

Plaintiff,

-v.-

PROJECT PRIMUS, INC.; EZZEDEEN M.
SOLEIMAN; and RAMI M. SHUBBAK,

Defendants.

---

25 Civ. 1113 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff Alexander Milne brought this suit against Project Primus, Inc.

("Project Primus"), Ezzedeen M. Soleiman, and Rami M. Shubbak (collectively,

"Defendants"), alleging that Defendants fraudulently induced him to invest

$1.25 million in a legacy wealth training program.  Before the Court is

Defendants' motion to dismiss Plaintiff's claims under Federal Rule of Civil

Procedure 12(b)(6).  For the reasons set forth below, the Court grants the

motion to dismiss.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff Alexander Milne is a resident of Ottawa, Canada, and an

investor in Project Primus.  (FAC ¶ 4; *see generally* FAC).  Defendant Project

---

[1]    This Opinion draws its facts from the First Amended Complaint (the "FAC" (Dkt. #24)),
the well-pleaded allegations of which are taken as true for purposes of this Opinion.
*See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  The Court also considers the
exhibits attached to the FAC ("FAC, Ex. [ ]"), which are incorporated by reference in the
FAC.  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining
that on a motion to dismiss, courts may consider documents incorporated by reference

Primus, which is now defunct, was a business corporation organized under the laws of Delaware with its principal place of business in New York.  (*Id.* ¶¶ 5, 50).  Defendants Ezzedeen M. Soleiman, a resident of New York, and Rami M. Shubbak, a resident of Florida, were co-founders and co-managing partners of Project Primus.  (*Id.* ¶¶ 6-7).  Mr. Milne first met Mr. Soleiman in 2020, around which time Mr. Soleiman helped Mr. Milne with seeking citizenship in a European country.  (*Id.* ¶ 13).

### 2. Project Primus and the Alleged Fraud

On October 8, 2023, about three years after their initial meeting, Mr. Soleiman reached out to Mr. Milne via email about Project Primus, a business venture "that would introduce the heirs of high net-worth individuals to cutting-edge businesses, instill life values and family responsibility in the enrollees, and develop the enrollees' entrepreneurship and business acumen." (FAC ¶ 16; *id.*, Ex. 1 at 4 ("October 8, 2023 Email")).  In the email, Mr. Soleiman claimed that he had "partnered with seasoned experts from Softbank, Google, and family office backgrounds" to create Project Primus, which "combines a venture studio with a venture capital fund" and allows "[f]amilies [to] invest on behalf of their heirs."  (FAC ¶ 16; October 8, 2023 Email).  Mr.

---

in or integral to a complaint).  In addition, the Court relies, as appropriate, on the declarations of Rami M. Shubbak ("Shubbak Decl." (Dkt. #27)) and Adam D. Cole ("Cole Decl." (Dkt. #28)) in support of Defendants' motion to dismiss as well as the exhibits attached thereto ("[Name] Decl., Ex. [ ]").

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #26), to Plaintiff's memorandum of law in opposition to Defendants' motion as "Pl. Opp." (Dkt. #31), and to Defendants' memorandum of law in reply as "Def. Reply" (Dkt. #32).

Soleiman sought Mr. Milne's "feedback on [his] new venture" and a meeting with Mr. Milne to "discuss different opportunities." (FAC ¶ 16; October 8, 2023 Email).

The next day, Mr. Soleiman sent Mr. Milne another email that included financial projections about Project Primus, in which email Mr. Soleiman solicited an investment of $1 million in exchange for a five-percent equity in the business venture. (FAC ¶ 18; *id.*, Ex. 2 at 2 ("October 9, 2023 Email")). The October 9, 2023 Email projected three scenarios of possible returns on investment: (i) a low scenario of a $1.92 million return in three to five years; (ii) a mid scenario of a $3.84 million return in four to six years; and (iii) a high scenario of a $7.20 million return in five to 10 years. (FAC ¶ 18; October 9, 2023 Email). In addition, the email described a subscription fee of $30,000 per student and a target of $20 million per cohort. (FAC ¶ 18; October 9, 2023 Email).

A slide deck attached to the email contained more information about Project Primus. (FAC ¶ 20; *id.*, Ex. 3 ("Slide Deck")). For example, both Mr. Soleiman and Mr. Shubbak claimed to have access to a strong global network of high-net-worth individuals and family offices as well as to interested investors. (FAC ¶ 20). Moreover, the Slide Deck offered a vision of Project Primus's training program: the first one to five years would focus on training enrollees in the world of business and investing through the venture studio; then, during the second to seventh years, the enrollees would join company boards and receive mentorship from industry experts; and finally, in years four

through ten, they would be introduced to potential M&A and IPO targets.  (*Id.*).

The Slide Deck also provided a concrete timeline for launching Project Primus's

operations from an investor's perspective: the first fund of $20 million in

investment would close by December 1, 2023; the venture studio would

become operational by January 2024; a second fund would be funded by

February 2024; and the venture would receive $100 million in investment by

December 2024.  (*Id.*).

    After discussing Project Primus in greater detail on the phone, Mr.

Soleiman soon offered to draft a stock purchase agreement to cement Mr.

Milne's investment in and collaboration with Project Primus.  (FAC ¶¶ 22-24;

*id.*, Ex. 4 ("October 13, 2023 Email")).  Mr. Milne claimed that during those

calls, Defendants repeatedly stated that:

> [i] [Mr.] Soleiman would find and enroll the heirs of
> ultra-high net worth individuals in the program;
> [ii] [Mr.] Shubbak would conduct Project Primus's
> training program; [iii] [Mr.] Soleiman had a robust
> network of ultra-high net worth individuals he would be
> able to bring into the program; [iv] the heirs of ultra-
> high net worth individuals were going to pay a
> $60,000.00 annual fee to enroll in the program plus
> provide a $1 million investment in Project Primus that
> would be used to invest in start-up projects that the
> enrollees would help manage; [v] the Defendants were
> in the process of enrolling students in the program;
> [vi] the Defendants were soliciting funds from other
> investors; [vii] the Defendants were taking steps to set
> up the virtual studio; [viii] [Mr.] Milne would make 3.5
> times the amount invested in the program; and [ix] the
> Defendants were taking all other steps necessary to
> effectuate Project Primus's business plans.

(FAC ¶ 24 ("Phone Conversations")).  Relying on that information, Mr. Milne

made an initial investment of $1 million in Project Primus on November 15,

2023.  (*Id.* ¶ 26; *see* Shubbak Decl., Ex. 1 ("Stock Purchase Agreement")). According to Mr. Milne, through that investment, he became "the sole financier for Project Primus and remained the sole source of money for the program throughout the company's existence."  (FAC ¶ 27).

Over the next few months, Defendants failed to enroll any students and therefore delayed the program's launch to the spring of 2024.  (FAC ¶¶ 29, 31). In the meantime, Mr. Soleiman spoke with the *Wall Street Journal* about Project Primus.  (*Id.* ¶ 32; *see id.*, Ex. 6 ("WSJ Article")).  Quoting Mr. Soleiman, the published article stated that there were "current students rang[ing] from about 26 to 31 years of age," that "[m]any of the company's clients made their fortunes in technology," and that "Project Primus [was] only working with U.S. and Canadian families" but looking to expand globally.  (FAC ¶ 32; WSJ Article).  According to Mr. Milne, at the time of the WSJ Article's publication, Project Primus had no students or clients.  (FAC ¶ 33).

Because Project Primus still had no enrollees by the spring of 2024, Defendants told Mr. Milne that they "planned to switch strategies by focusing on building relationships with wealth management companies," which could lead to introductions to ultra-high-net-worth families.  (FAC ¶ 34).  Even after this pivot, Defendants failed to make any significant connections or enroll a single student in the ensuing months.  (*Id.* ¶ 35).  Mr. Milne began questioning Defendants' use of his investment in the summer of 2024, especially given "the exorbitant spending that was taking place."  (*Id.* ¶¶ 36-37).  Indeed, Defendants spent significant amounts of money — commensurate with the clientele they

were seeking to woo — on travel, high-end restaurants, and an apartment in Manhattan that was meant for hosting events for ultra-high-net-worth individuals. (*Id.* ¶ 37; *see id.*, Ex. 7 ("List of Personal Expenses")).

In the fall of 2024, Defendants promised that "Project Primus was going to turn over a new leaf" and asked Mr. Milne to invest an additional $250,000. (FAC ¶ 39). Specifically, Defendants planned to use that money to enroll a group of students for free in a "loss leader" program, which Defendants also planned to film and use as marketing materials. (*Id.*). Mr. Milne agreed to provide the additional funding on the condition that Mr. Soleiman would be removed from Project Primus's payroll. (*Id.* ¶ 41). Mr. Shubbak allegedly accepted Mr. Milne's demand, and Mr. Milne invested an additional $250,000 on October 1, 2024. (*Id.* ¶¶ 42-43).

A few days later, on October 10, 2024, 15 students enrolled for free as the first cohort of Project Primus. (FAC ¶ 44). Mr. Shubbak allegedly trained the enrollees and engaged in one-on-one discussions with each of them in recorded sessions. (*Id.* ¶ 45). Upon reviewing the recorded sessions, however, Mr. Milne claimed that Mr. Shubbak "had no intention of training the students on how to manage and invest the wealth they stood to inherit," and instead spent the time "trying to ingratiate himself into the students' lives and family businesses" for his own personal benefit. (*Id.* ¶¶ 46-47). Mr. Milne also learned that Mr. Shubbak never removed Mr. Soleiman from Project Primus's payroll. (*Id.* ¶ 48). Mr. Milne described Mr. Shubbak's "misconduct and

additional lies" as "final straws" that led him to disband the first cohort of students and shut down Project Primus. (*Id.* ¶¶ 49-50).

## B.    Procedural Background

On February 7, 2025, Mr. Milne filed a Complaint in this Court against all three Defendants. (Dkt. #1). The purpose of the action was to "recover the [$1.25 million] that was fraudulently taken from [Mr. Milne] and improperly diverted." (*Id.* at 10). On April 7, 2025, Defendants filed a pre-motion letter in anticipation of moving to dismiss Mr. Milne's Complaint. (Dkt. #14). In light of Defendants' letter, the Court scheduled a pre-motion conference, which was held on May 28, 2025. (Dkt. #15, 17, 20; *see* May 28, 2025 Minute Entry). At the conference, the Court gave Mr. Milne an opportunity to amend his Complaint and directed the parties to propose a briefing schedule. (May 28, 2025 Minute Entry).

According to the parties' proposed schedule (Dkt. #21), which the Court endorsed (Dkt. #22), Mr. Milne filed his First Amended Complaint (the "FAC") on June 6, 2026 (Dkt. #24). In the FAC, Mr. Milne alleged 10 causes of action: (i) violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by all three Defendants; (ii) violation of Section 20(a) of the Exchange Act by the two individual Defendants; (iii) common-law breach of fiduciary duty; (iv) negligent misrepresentation; (v) negligence; (vi) fraud, fraudulent misrepresentation, and fraudulent inducement; (vii) unjust enrichment and establishment of constructive trust; (viii) accounting; (ix) breach of implied contract; and

7

(x) promissory estoppel.  (FAC ¶¶ 52-123).[2]  He sought damages in the amount of $1.25 million plus interest, a declaration of unjust enrichment, the imposition of a constructive trust to recoup those unjust benefits, a full accounting of the funds Mr. Milne invested in Project Primus, punitive damages, and attorney's fees and costs.  (*Id.* at 22).

On June 24, 2025, Defendants filed their motion to dismiss the FAC along with supporting papers.  (Dkt. #25-28).  Mr. Milne filed his opposition on July 9, 2025.  (Dkt. #31).  Defendants filed their reply on July 16, 2025.  (Dkt. #32).

## DISCUSSION

### A.    Applicable Law

On a Rule 12(b)(6) motion, the court "draw[s] all reasonable inferences in [a plaintiff's] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-79 (2009).  The plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, the court is "not bound to accept conclusory allegations or legal

---

[2]    In his opposition, Mr. Milne "moves to withdraw his [c]auses of [a]ction for breach of an implied contract … and promissory estoppel."  (Pl. Opp. 23).  The Court grants that motion and therefore does not consider the ninth and tenth causes of action in its analysis.

conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Smith* v. *Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002)).  Indeed, the plaintiff must do more than provide a "formulaic recitation of the elements of a cause of action" — that is, his "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In addition, as relevant here, "[s]ecurities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Emps.' Ret. Sys. of Gov't of the V.I.* v. *Blanford*, 794 F.3d 297, 304 (2d Cir. 2015).  "Prior to the enactment of the [Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4], the sufficiency of a complaint for securities fraud was governed only by [Federal] Rule [of Civil Procedure] 9." *Blanford*, 794 F.3d at 304.  But "[t]he PSLRA builds on Rule 9's particularity requirement, dictating the pleading standard for claims brought under the Exchange Act." *Id.*  Accordingly, a complaint alleging securities fraud must satisfy both Rule 9 — specifically Rule 9(b) — and the PSLRA.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 99.

*First*, Rule 9(b) requires that "a party … state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  "A securities fraud complaint based on misstatements must [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were

fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak* v. *Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). "While Rule 9(b) demands specificity as to the circumstances of an alleged fraud, it allows a plaintiff to 'allege[ ] generally' any requisite state of mind, *e.g.*, '[m]alice, intent, [or] knowledge[.]'" *Genesee Cnty. Emps.' Ret. Sys.* v. *DocGo Inc.*, 773 F. Supp. 3d 62, 78 (S.D.N.Y. 2025) (alterations in original) (quoting Fed. R. Civ. P. 9(b)).

*Second*, the PSLRA requires the plaintiff to "do more than say that [a defendant's] statements ... were false and misleading; [he] must demonstrate with specificity why and how that is so." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In other words, the "plaintiff[ ] cannot rest on [his] say-so that these statements are fraudulent; [he] must explain why." *Id.* at 175. To do so, the plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, where the plaintiff brings a Section 10(b) or Rule 10b-5 claim — for which the requisite state of mind is scienter, namely an "intent to deceive, manipulate, or defraud" — "[S]ection [78u-4(b)(2)(A)] of the PSLRA ... requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with [scienter].'" *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (internal quotation marks omitted) (first quoting *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); and then quoting 15

10

U.S.C. § 78u-4(b)(2)(A)).  "To qualify as 'strong' ... an inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc.*, 551 U.S. at 314; *accord Saraf* v. *Ebix, Inc.*, No. 23-1182-cv, 2024 WL 1298246, at *1 (2d Cir. Mar. 27, 2024) (summary order).

## B.   The Court Grants Defendants' Motion to Dismiss

Project Primus failed, as do many startup business ventures.  But not every failed startup is a fraud.  Understandably unhappy with the loss of his investment, Mr. Milne raises the specter of misconduct — incanting throughout his submissions that Project Primus was a "sham" company.  (*See, e.g.*, FAC ¶¶ 21, 25).  But Mr. Milne's own detailed factual allegations — which include business plans, media outreach efforts, and actual training sessions — put the lie to his claim of scheme liability.  As a fallback position, Mr. Milne argues that Defendants tricked him with numerous material misstatements about Project Primus, its goals, and the path to their achievement.  However, a careful review of the FAC makes plain that the challenged statements were statements of corporate optimism, and not actionable fraud.  Defendants may have been poor businessmen with pie-in-the-sky aspirations that they could never achieve, but Mr. Milne has failed to allege that they were fraudsters.

### 1.   Mr. Milne Did Not Adequately Plead Securities Fraud Under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe."  15 U.S.C. § 78j(b).  Section 10(b)'s implementing rule, Rule 10b-5, makes it unlawful "[t]o employ any device, scheme, or artifice to defraud," 17 C.F.R. § 240.10b-5(a), or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," *id.* § 240.10b-5(c).  In addition, a separate subsection prohibits "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Id.* § 240.10b-5(b).  Critically, any alleged fraud under Rule 10b-5 must be perpetuated "in connection with the purchase or sale of any security."  *Id.* § 240.10b-5.

Mr. Milne argues that his first federal securities fraud claim is "based upon subsections (a) and (c) of Rule 10b-5, which cover much broader 'scheme liability' and have different pleading and substantive requirements" from the more common material misstatement claim under Rule 10b-5(b).  (Pl. Opp. 1).  Accordingly, the Court focuses on scheme liability in its analysis and determines that Mr. Milne has failed to plead the requisite elements.  But as the Court explains in greater detail below, Mr. Milne's claim would also fail under Rule 10b-5(b) for substantially the same reasons.

### a.    Mr. Milne Did Not Adequately Plead Scheme Liability

"To state a scheme liability claim, a plaintiff must show: '[i] that the defendant committed a deceptive or manipulative act, [ii] in furtherance of the

12

alleged scheme to defraud, [iii] with scienter, and [iv] reliance.'" *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)).  In addition, because a scheme claim "sound[s] in fraud," it is subject to the heightened pleading requirements of Rule 9(b).  *Id.*; *see In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 621-22 (S.D.N.Y. 2005) (explaining that while the PSLRA's pleading requirements for misstatements do not apply to scheme claims, such a claim still requires the plaintiff to "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue").  And regarding the requisite state of mind, a scheme claim is "subject to [the PSLRA's] heightened pleading requirements regarding *scienter.*"  *In re Parmalat*, 383 F. Supp. 2d at 621.

Mr. Milne contends that his allegations satisfy the four-part test for scheme liability.  (Pl. Opp. 10-20).  In essence, Mr. Milne claims that Defendants used "a sham business to bilk [him] out of his money," and that "they diverted their ill-gotten gains to pay for personal goods and services."  (*Id.* at 14).  Defendants, however, argue that Mr. Milne failed to adequately plead the first and third elements of scheme liability — that is, Mr. Milne did not allege a purported act that was deceptive or manipulative, especially as distinct from any alleged misstatement by Defendants, and he failed to provide a strong inference of scienter.  (Def. Reply 3-8).  The Court agrees with Defendants that

because those two elements are lacking, it must dismiss Mr. Milne's Section 10(b) claim.

*First*, "scheme liability is triggered where the defendant 'performed an inherently deceptive act that was distinct from an alleged misstatement: *i.e.,* sham agreements, sham transactions, [or] sham companies[.]'" *SEC* v. *Farnsworth*, 692 F. Supp. 3d 157, 189 (S.D.N.Y. 2023) (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022)).  Put differently, the plaintiff must plead that the defendant "did something more than just engage in misstatements." *Id.* at 190.  Indeed, the Second Circuit has instructed that while "misstatements and omissions can form *part* of a scheme liability claim, … an actionable scheme liability claim also requires something *beyond* misstatements and omissions, such as dissemination." *SEC* v. *Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).

Mr. Milne repeatedly characterizes Project Primus as a "sham" entity, but the level of detail that he includes in the FAC regarding legitimate conduct taken by Defendants in service of the company belies any such description. (*Compare* FAC ¶¶ 21, 25, *and* Pl. Opp. 1-5, 7, 9-11, 13-17, 19, 20 ("sham" references), *with* FAC ¶¶ 20 (Project Primus's business plan), 32 (WSJ Article), 34 (business decision to pivot to wealth management companies as source of clients), 44-45 ("loss leader" training seminar)).  Mr. Milne also seeks to analogize Project Primus to a pump-and-dump scheme, but even a cursory comparison of the cases in this area proves him wrong.  (*See* Pl. Opp. 13-14).  A pump-and-dump scheme typically involves a defendant who secretly takes

14

control of a company, "pumps" the stock prices of that company through fraudulent promotional campaigns, and then "dumps" the shares that he had previously amassed at an artificially inflated price to capture the delta. *See, e.g.*, *SEC* v. *Airborne Wireless Network*, No. 21 Civ. 1772 (CM), 2023 WL 5938527, at *23 (S.D.N.Y. Sept. 12, 2023); *SEC* v. *DeFrancesco*, 683 F. Supp. 3d 367, 375 (S.D.N.Y. 2023); *SEC* v. *Stubos*, 634 F. Supp. 3d 174, 182 (S.D.N.Y. 2022). And, to be sure, courts have described pump-and-dump schemes as "inherently decepti[ve] conduct, separate and apart from whatever misstatements were made about what was going on." *Airborne Wireless Network*, 2023 WL 5938527, at *23. But here, there is no such pump-and-dump scenario. Mr. Milne himself purchased stock in Project Primus, and Defendants neither pumped up the price nor dumped their own shares of Project Primus. More critically, the deception inherent in pump-and-dump schemes is simply lacking in this case.

Separately, Mr. Milne identifies several alleged acts by Defendants that he claims are inherently deceptive and support scheme liability. To start, Mr. Milne argues that Defendants failed to enroll a single student in the program during the spring and summer of 2024, before they asked Mr. Milne to invest another $250,000. (FAC ¶¶ 29, 31, 35; Pl. Opp. 11). Then, after Mr. Milne provided additional investment to fund a "loss leader" cohort of students, which did in fact materialize, Mr. Milne claims that Defendants ingratiated themselves with the students and their families for their own benefit rather than for the good of the business. (FAC ¶¶ 39-40, 44-50; Pl. Opp. 11).

15

Moreover, Mr. Milne contends that during the entirety of Project Primus, Defendants diverted and used his investment to pay for personal goods and services.  (FAC ¶¶ 36-38; Pl. Opp. 11; *see* List of Personal Expenses).

None of those purported acts is inherently deceptive or manipulative. Regarding Defendants' failure to enroll students before receiving additional funding, Mr. Milne did not allege that Defendants failed to put any effort into recruiting students or actively tried to sabotage recruitment efforts.  *Cf. Farnsworth*, 692 F. Supp. 3d at 189-90 (finding deception where the defendants made public statements about a natural drop-off in ticket usage rates when in fact they used various means to artificially restrict usage rates, such as blocking subscriber access, invalidating passwords, and imposing ticket-verification protocols).  Defendants' failure in and of itself does not lead to a reasonable inference of deception.  Indeed, on Mr. Milne's own telling of events, Defendants were simply incompetent and lacked the wherewithal to recruit ultra-high-net-worth individuals.

In addition, Defendants' ingratiating behavior toward the "loss leader" cohort may seem distasteful to Mr. Milne, but it is also not inherently deceptive.  As an initial matter, the Court finds this whole line of argument puzzling:  It struggles to understand why ingratiating oneself with prospective clients is bad (or, indeed, fraudulent) conduct, or how, precisely, Defendants could ingratiate themselves with prospective clients in a manner that benefited themselves individually but not Project Primus.  In any event, Mr. Milne acknowledged in the FAC that Defendants recruited 15 students to enroll in

16

the "loss leader" cohort, that Mr. Shubbak trained them and engaged in one-on-one discussions with each of the students, and that Defendants recorded the sessions, presumably for training and marketing purposes. (FAC ¶¶ 44-47; *see id.* ¶ 39). That Defendants may have ingratiated themselves into the students' lives and their family businesses at the same time does not counter their actual efforts to recruit, train, and develop this cohort of enrollees. Nothing about their conduct suggests that they lied to Mr. Milne about their intentions regarding the "loss leader" cohort, or that they used his follow-on investment of $250,000 for anything other than this training program.

Defendants' accumulation of expenses throughout the duration of Project Primus similarly does not reasonably reflect a deceptive misappropriation of funds. The FAC claimed that Defendants spent money on "extensive travel, high-end restaurants, and many other luxuries, including paying rent for an apartment in Manhattan that was purportedly being used to host events for ultra-high net worth individuals for the purpose of creating relationships, which would supposedly lead to enrollees." (FAC ¶ 37). But in so arguing, Mr. Milne overlooks the startup nature of Project Primus, and the truism that to make money, one must start by spending money. The FAC added that when "Project Primus's staff asked … Defendants for receipts for the exorbitant spending that was taking place," they failed to produce the receipts, though Mr. Milne still managed to obtain and include a partial list of Defendants' expenses. (*Id.*; *see* List of Personal Expenses). Nevertheless, the FAC did not allege that Defendants incurred those expenses through deception, *i.e.*, that they lied to

17

Mr. Milne about the use of the funding.  *Cf. SEC* v. *Penn*, 225 F. Supp. 3d 225, 236 (S.D.N.Y. 2016) (determining that the defendant "engaged in an inherently deceptive act" when he diverted money, falsified invoices, and disguised "the ultimate recipient of the funds through sham transactions").  And while Mr. Milne describes Exhibit 7 of the FAC as a "partial list of the personal goods and services that the Defendants purchased using [Mr.] Milne's financing" (FAC ¶ 37), a review of that list reveals that the vast majority of the spending concerned typical business expenses, such as travel, food, lodging, and IT services.  Mr. Milne seems more upset that the money spent by Defendants did not produce any enrollees in Project Primus than that Defendants incurred expenses in pursuit of that goal.  Neither amounts to fraud.

Perhaps recognizing the limits of his claims regarding Defendants' *actions*, Mr. Milne also points to allegedly false *statements* made by Defendants as constituting part of the putative scheme.  (Pl. Opp. 11-13).  But without the deceptive acts, misstatements alone are insufficient for scheme liability.  *See Rio Tinto*, 41 F.4th at 49, 53 (ruling that "misstatements and omissions alone [cannot] form the basis for scheme liability"); *see also Turquoise Hill*, 625 F. Supp. 3d at 249 (explaining that litigants are not permitted to "repackage any Rule 10b-5(b) claims as Rule 10b-5(a) or (c) claims and thus avoid the heightened pleading standard in cases involving private plaintiffs").  In the Second Circuit, Mr. Milne must allege "extra" facts accompanying those misstatements to meet the pleading standard, and he did not do so here.  *See*

18

*Turquoise Hill*, 625 F. Supp. 3d at 248.  He has thus failed to allege an actionable scheme.

*Second*, and independently, Mr. Milne fails to satisfy the scienter element of his scheme liability claim, which element requires him to plead "an intent to deceive, manipulate[,] or defraud."  *Turquoise Hill*, 625 F. Supp. 3d at 234 (internal quotation marks omitted) (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)).  Scienter "may be established either by [i] alleging facts to show that the defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Farnsworth*, 692 F. Supp. 3d at 185 (internal quotation marks omitted) (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).  Moreover, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc.,* 551 U.S. at 324.

In this case, Mr. Milne argues that he sufficiently pleaded both motive and opportunity as well as conscious misbehavior or recklessness.  (Pl. Opp. 17-19).  This Court disagrees.  To support the motive and opportunity theory, Mr. Milne must allege that Defendants "benefitted in some concrete and personal way from the purported fraud," such as undertaking some deceptive conduct to "sell their own shares at a profit."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Novak,* 216 F.3d at 307-08).  Mr. Milne

claims that Defendants benefitted from "stealing [Mr.] Milne's money and using it to pay for personal goods and services." (Pl. Opp. 18).  But even the FAC acknowledged that the expenses, albeit exorbitant and perhaps unwise, were part of Project Primus's operations — for example, renting an apartment in Manhattan to "host events for ultra-high net worth individuals for the purpose of creating relationships, which would supposedly lead to enrollees."  (FAC ¶ 37).  As Defendants point out, when considered holistically with the fact that Defendants hired staff to operate Project Primus, enrolled a 15-person "loss leader" cohort, and marketed their business by speaking with the press in the WSJ Article, the inference that Mr. Milne would like the Court to draw is nowhere near as compelling as the inference that Defendants were simply spending money on (ultimately unavailing) efforts to bring the idea of Project Primus to fruition.  (Def. Br. 19-20; Def. Reply 7-8; *see* FAC ¶¶ 32, 37, 44; WSJ Article).  *See Gao* v. *Yang*, No. 20 Civ. 7285 (JPO), 2022 WL 2193290, at *4 (S.D.N.Y. June 17, 2022) (explaining that the plaintiff's allegations left "plenty of room for [the defendant's] competing explanation that he was using corporate funds to purchase capital and for related expenses").

Furthermore, Mr. Milne's allegations do not constitute strong circumstantial evidence of conscious misbehavior or recklessness.  Under this theory, "scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Farnsworth*, 692 F. Supp. 3d at 186 (internal quotation marks omitted)

(alteration adopted) (quoting *SEC* v. *Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016)). Mr. Milne argues that "[t]he misappropriation of more than $1 million constitutes intentional, unlawful conduct and represents a significant departure from the standard of care that Defendants were obligated to uphold." (Pl. Opp. 19). However, Mr. Milne's own allegations largely contradict the notion of misappropriation, as the FAC acknowledged that Defendants used Mr. Milne's funding to recruit students, hire staff, rent an apartment in Manhattan for hosting events, market Project Primus, enroll a "loss leader" cohort, and so on, which all constitute reasonable expenses as part of Project Primus's operations. (Def. Br. 19-20; Def. Reply 7-8; *see* FAC ¶¶ 32, 37, 44; WSJ Article). That the list of expenses also included travel and dining does not raise a strong inference of either intentional misbehavior or highly unreasonable behavior, especially under the heightened pleading standard for securities fraud.

> **b.    Mr. Milne Did Not Adequately Plead Any Material Misrepresentation or Omission**

In addition to scheme liability, Mr. Milne also attempts to shoehorn his allegations into a violation of Rule 10b-5(b), which prohibits the making of material misstatements. 17 C.F.R. § 240.10b-5(b). (Pl. Opp. 15-17). As interpreted by the Supreme Court, a *prima facie* case for securities fraud under this subsection consists of six elements: "[i] a material misrepresentation or omission by the defendant; [ii] scienter; [iii] a connection between the misrepresentation or omission and the purchase or sale of a security;

21

[iv] reliance upon the misrepresentation or omission; [v] economic loss; and [vi] loss causation." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 157 (2008); *see also Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). Moreover, such a claim must satisfy the heightened pleading requirements of both Rule 9 and the PSLRA.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 99.

For much the same reason that the FAC did not sufficiently plead scheme liability, the material misrepresentation claim fails for lack of a strong inference of scienter.  (*See supra* B.1.a.).  In short, because scienter is a common element required by both claims, Mr. Milne's failure to adequately plead Defendants' intent to defraud disposes of the material misrepresentation claim as well.  Furthermore, the Court determines that this claim also fails on the first element — that is, Mr. Milne failed to plead any actionable misstatement.  In his briefing, Mr. Milne primarily focuses on three sets of statements: (i) Defendants' financial projections about Project Primus in the October 9, 2023 Email (FAC ¶ 18); (ii) Defendants' financial projections about Project Primus in the Slide Deck (*id.* ¶ 20); and (iii) Defendants' alleged lies about recruiting students and operationalizing Project Primus during the Phone Conversations (*id.* ¶ 24).  (Pl. Opp. 15-17).  None of those statements constitutes a material misrepresentation or omission.

The statements about Project Primus in the October 9, 2023 Email and the Slide Deck are exactly what Defendants described them to be — financial projections about the future, not guarantees of some concrete outcome or misrepresentations about the business's existing circumstances.  The Second

22

Circuit is clear that "statements containing simple economic projections, expressions of optimism, and other puffery are insufficient." *Novak*, 216 F.3d at 315; *see also Rombach*, 355 F.3d at 175 (determining that "the analysts' reports contain[ing] financial projections and statements of guarded optimism" were merely expressions of puffery or misguided optimism that were "not actionable as fraud").  Contrary to Mr. Milne's suggestion (*see* Pl. Opp. 15-16 (claiming that the statements "set concrete, objectively verifiable deadlines")), the timeline, amount of funding, and possible returns on investment provided in Defendants' statements constitute entirely aspirational projections.  Further confirmation that these statements are puffery is the fact that in the October 9, 2023 Email and the Slide Deck, Defendants provided no basis for their calculations and pointed to no concrete, existing facts that could support their projections.  *Cf. Novak*, 216 F.3d at 315 (finding liability because in addition to "rosy predictions," the defendants expressed confidence in the existing inventory situation while "they allegedly knew that the contrary was true").[3] Therefore, those statements are not actionable as fraud.

Moreover, Mr. Milne did not plead with particularity that Defendants' statements during the Phone Conversations were false.  Defendants told Mr. Milne that they would recruit the heirs of ultra-high-net-worth individuals, set

---

[3]    In his opposition, Mr. Milne cites *Farnsworth* for the proposition that statements of opinion can give rise to liability when the speaker does not believe in them, the supporting facts are untrue, or there is a misleading omission.  (Pl. Opp. 16-17).  *See* 692 F. Supp. 3d at 179.  However, he has made no non-conclusory allegations that Defendants did not believe in the statements when they were made, that the facts existing at the time were untrue, or that information known to Defendants at the time was omitted.

up the training program and venture studio, and solicit funding from other investors, among other actions to operationalize Project Primus.  (FAC ¶ 24). While those actions allegedly did not result in any enrollees until Defendants changed course and organized the free "loss leader" cohort, Mr. Milne did not explain in the FAC why and how those statements were untrue at the time Defendants made them.  *See Rombach*, 355 F.3d at 174 ("To succeed on this claim, plaintiffs must do more than say that the statements … were false and misleading; they must demonstrate with specificity why and how that is so."). Indeed, there is no indication in the FAC that Defendants did not intend or attempt to carry out those actions.  To the contrary, as Defendants point out, that Project Primus did not "enroll trainees at the level hoped for" or achieve its financial objectives was most likely an issue of mismanagement.  (Def. Br. 14-15).  *See Boca Raton Firefighters and Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 36 (2d Cir. 2012) (summary order) ("Section 10(b) … does not reach mere 'instances of corporate mismanagement.'" (quoting *Santa Fe Indus., Inc.* v. *Green*, 430 U.S. 462, 477 (1977))).[4]

---

[4]    While Mr. Milne does not analyze the WSJ Article as containing material misrepresentations, he briefly mentions "false statements" in the article in the "facts" section of his briefing.  (*See* Pl. Opp. 6; *see* FAC ¶¶ 32-33).  To the extent he means to include this article among Defendants' putative misstatements, the Court finds that Mr. Milne has failed to plead with particularity why and how Defendants' statements in the article were false, especially because the article also quotes a current student who independently said she was enrolled in the second year of the Project Primus program.  (*See* WSJ Article at 4-5).  Mr. Milne has also not attempted to explain the apparent contradiction between his allegations and the WSJ Article's representations.  In any event, even if the WSJ Article contained plausible misstatements, the claim would still fail on scienter.

In sum, because Mr. Milne did not adequately plead scheme liability or any actionable misstatement, the Court dismisses his claim under Section 10(b) and Rule 10b-5.

### 2. Mr. Milne's Section 20(a) Claim Fails For Lack of a Primary Violation

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of [that] chapter or of any rule or regulation thereunder" is jointly and severally liable "with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  Moreover, "[a]ny claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law."  *Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010) (citing *Rombach*, 355 F.3d at 177-78).  Accordingly, "[t]o state a claim of control person liability under § 20(a), 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 108).

Because Mr. Milne failed to adequately allege a Section 10(b) claim, his second federal securities claim under Section 20(a) also fails as a matter of law.

25

*Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends* v. *Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 542 (S.D.N.Y. 2023).  The Court therefore dismisses Mr. Milne's Section 20(a) claim as well.

### 3.    Mr. Milne Also Failed to State Plausible Common-Law Claims

Separate from his federal securities claims, Mr. Milne — who is diverse from Defendants and seeking more than $75,000 in damages — brings several common-law causes of action: negligent misrepresentation; fraud, fraudulent misrepresentation, and fraudulent inducement; breach of fiduciary duty; negligence; unjust enrichment and establishment of constructive trust; and accounting.  (FAC ¶¶ 10-11, 72-105; *see id.* ¶¶ 4-7).  None of those claims survives Defendants' motion to dismiss.

*First,* because the common-law claims of negligent misrepresentation and fraud require the existence of a material misrepresentation, they fail for the same reason as Mr. Milne's Rule 10b-5(b) claim.  "Under New York law, [one of] the five elements of a fraud claim … [is] a material misrepresentation or omission of fact." *Crigger* v. *Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006).  Furthermore, "[n]egligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement." *DeBlasio* v. *Merrill Lynch & Co.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *32 (S.D.N.Y. July 27, 2009) (internal quotation marks omitted) (quoting *Carroll* v. *LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 510 (S.D.N.Y. 2009)).  As the Court has already explained, Mr. Milne failed to plead with particularity that any of Defendants' statements was

26

false or misleading; and Defendants' forward-looking projections constituted nonactionable statements of puffery or corporate optimism at best.  (*See supra* B.1.b).  Therefore, without sufficient allegations of a material misrepresentation, Mr. Milne's negligent misrepresentation and fraud claims must be dismissed.

*Second*, on the fiduciary duty and negligence claims, Mr. Milne fails to plead a breach of any cognizable duty owed to him by Defendants.  "Under New York law, a claim for breach of fiduciary duty has three elements: [i] the existence of a duty on defendant's part as to plaintiff; [ii] a breach of this duty; and [iii] injury to the plaintiff as a result thereof."  *DeBlasio*, 2009 WL 2242605, at *28 (internal quotation marks omitted) (quoting *Alfaro* v. *Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).  Similarly, the elements of a negligence claim include "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach."  *Lombard* v. *Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).  Citing New York law, Mr. Milne argues that Defendants owed a promoter-based duty to investors like himself.  (Pl. Opp. 21-23).  *See Roni LLC* v. *Arfa*, 18 N.Y.3d 846, 848-49 (2011) (finding an adequate pleading of a fiduciary relationship where "the promoter defendants planned the business venture, organized the limited liability companies, solicited [the plaintiffs'] involvement[,] and exercised control over the invested funds").  In opposition, Defendants persuasively contend that because Project Primus was incorporated in Delaware, Delaware law applies, and Delaware recognizes only a direct fiduciary relationship

27

between promoters and the corporation itself. (Def. Reply 8-9). *See Gladstone v. Bennett*, 153 A.2d 577, 582 (Del. 1959). In addition, while Mr. Milne does not specifically address the duty element of his negligence claim in his briefing, the FAC described it as "a duty to exercise reasonable care when providing investment advice and recommendations that included a duty to truthfully state how [Mr.] Milne's funds were going to be used and were used." (FAC ¶ 88).

Even assuming that Defendants owed a promoter-based duty or a general duty of care to Mr. Milne, the claims fail because the alleged breach of that duty is based on Defendants' fraudulent conduct, which Mr. Milne has not sufficiently alleged in the FAC. Indeed, "the heightened pleading standard of Rule 9(b) applies to ... [all] claims [that] are premised on allegations of fraud," *Rombach*, 353 F.3d at 171, including "state law claims of breach of fiduciary duty," *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, Nos. 02 MDL 1484 (JFK), 02 Civ. 8472 (JFK), 2008 WL 2594819, at *8 (S.D.N.Y. June 26, 2008), and, in this case, negligence based on Defendants' alleged misappropriation (FAC ¶ 88). Again, as the Court has discussed above, Mr. Milne did not plead with sufficient particularity that Defendants undertook deceptive or manipulative acts, that they made false or misleading statements, or that they acted with the requisite intent to defraud. (*See supra* B.1). Without the underlying fraud, then, claims alleging breach of duties owed to Mr. Milne based on that fraud also cannot move forward. *See, e.g.*, *DeBlasio*, 2009 WL 2242605, at *31-32, 36 (determining that the plaintiffs' "allegations

[were] insufficient as a matter of law to satisfy the 'breach' element" of their fiduciary duty and negligence claims).

*Third,* Plaintiffs' remaining claims of unjust enrichment and accounting must be dismissed because an existing contract governs the subject matter of the dispute. "Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish [i] that the defendant was enriched; [ii] that the enrichment was at the plaintiff's expense; and [iii] that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp* v. *F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001). And to obtain an accounting of funds in New York, the plaintiff must show "[i] relations of a mutual and confidential nature; [ii] money or property entrusted to the defendant imposing upon him a burden of accounting; [iii] that there is no adequate legal remedy; and [iv] in some cases, a demand for an accounting and a refusal." *Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 207 (S.D.N.Y. 2011) (internal quotation marks omitted) (quoting *IMG Fragrance Brands, LLC* v. *Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009)). Both are equitable claims that are typically raised when a valid and enforceable contract does not exist to support a breach-of-contract claim. In fact, "[c]ourts have not allowed claims for unjust enrichment … [to proceed] where there is a valid and enforceable written contract governing the subject matter of the dispute." *Kottler* v. *Deutsche Bank AG,* 607 F. Supp. 2d 447, 467 (S.D.N.Y. 2009). And "an equitable accounting claim cannot coexist with a breach of contract claim

covering the same subject matter." *Ellington Credit Fund*, 837 F. Supp. 2d at 207.

Here, there exists an operative contract, namely "Project Primus'[s] initial agreement to sell a '5% equity' stake to Plaintiff in exchange for $1 million as proposed and … reflected in the written stock purchase agreement [that] Plaintiff signed." (Def. Br. 25; *see* FAC ¶ 18; Stock Purchase Agreement). Mr. Milne does not contest the validity or enforceability of this contract. Rather, in his briefing, he affirmatively withdraws two other quasi-contract claims, namely breach of implied contract and promissory estoppel. (Pl. Opp. 23). Even though Mr. Milne did not bring a breach-of-contract claim in his FAC, the very fact that the written Stock Purchase Agreement exists also precludes his unjust enrichment and accounting claims. Accordingly, the Court dismisses those claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated: March 10, 2026
       New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

30